UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JJ COMMUNICATIONS, INC.,

    Plaintiff,

v.

DURATECH, INC., et al.,

    Defendants.

No. C04-1746P

ORDER ON SUMMARY JUDGMENT MOTIONS

    This matter comes before the Court on: (1) Defendant George Chon's motion for partial summary judgment; and (2) Plaintiff's cross-motion for summary judgment, which Defendants have moved to strike as untimely and improperly noted. None of the parties have requested oral argument. Having reviewed the papers and pleadings submitted by the parties, the Court hereby ORDERS as follows: (1) Defendant Chon's motion for partial summary judgment is GRANTED; and (2) Plaintiff's cross-motion for summary judgment is STRICKEN. The reasons for the Court's Order are set forth below.

**Background**

1.    <u>The Parties</u>

    Plaintiff JJ Communications ("JJC") is a New Jersey corporation that manufactures and sells cameras and other video equipment. Plaintiff names four defendants in its amended complaint:

(1)    Duratech, Inc., a Washington corporation based in Kent, Washington that is a wholesale distributor of outdoor sporting equipment;

(2)    George Chon, the president, CEO, and sole shareholder of Duratech;

ORDER - 1

(3) Shina America, Inc., which is allegedly a Washington corporation based in Kent;

(4) Shina Sport, Ltd., which is allegedly the parent company of Shina America, with offices in Korea.

In his opening brief, Defendant Chon states that Shina Sport and Shina America filed for bankruptcy in June of 2002 and no longer exist. (Dkt. No. 28 at 1, n.1). Neither party provides additional information about the Shina companies.

2. Factual Overview

In April 2001, Defendant Duratech entered into a sales representative agreement with a company called NuTeck Enterprise. NuTeck also served as a sales representative for Plaintiff JJC. A NuTeck employee named Dick Ryan worked with both Duratech and JJC, and it appears that Mr. Ryan sometimes served as an intermediary between the companies.

2001 Costco "Road Show"

NuTeck arranged for Duratech to do a two-week "road show" at a Seattle Costco store in August 2001. In a road show, a vendor is allowed to set up a booth inside a Costco store to sell its products on a limited basis in order to evaluate the future saleability of the products. A road show is a "consigned show," meaning that Costco does not take title to the products offered for sale. In order to take part in this road show, Duratech had to complete certain administrative steps to become a "vendor of record" with Costco.

Shortly after NuTeck arranged for Duratech to do this road show, Defendants maintain that NuTeck began marketing JJC's cameras to Costco. According to Defendants, JJC's cameras were well-received, but Costco did not want to go through the administrative work involved in setting up JJC as a separate "vendor of record." Instead, Costco and NuTeck asked JJC to "work its product" through Duratech's August 2001 road show. (Dkt. No. 29, Ex. F).

Mr. Chon asserts that JJC supplied a dozen cameras for the 2001 road show, with the understanding that JJC was not actually selling these products to Duratech. Mr. Chon states that

ORDER - 2

Duratech sent JJC the proceeds from the sales of these cameras and returned the remaining unsold product.  Mr. Chon asserts that ownership interest in JJC's product was never transferred to either Duratech or Costco.  However, the question of whether Duratech ever "purchased" any products from JJC is disputed by the parties.

### 2002 Costco Road Show

Based on the success of the first "road show," NuTeck negotiated a deal for Duratech to do a second, larger Costco road show in 2002, with events in over 175 stores in 29 different states.  The second road show began the week of February 28, 2002.

According to Mr. Chon, JJC made a commitment to provide $370,000 worth of products for Duratech's 2002 road show.  Mr. Chon states that under this deal, Duratech would again be the "vendor of record," and would send JJC the proceeds of any sales of JJC's product after Duratech received payments for the products from Costco.

In December 2001, JJC's president Jay Kim told NuTeck that his bank would not approve shipment of goods for the second Costco road show unless payment was guaranteed.  To address this concern, Mr. Chon states that JJC requested a purchase order for its merchandise in the amount of $370,000; Mr. Chon claims that this purchase order was requested by JJC "in order to induce its bank to allow JJC to participate in the Costco road show."  (Dkt. No. 29 at 4).  Duratech sent a $370,000 purchase order to JJC.  For reasons that are not explained, this purchase order had a handwritten note that "All Sales to Be Guaranteed to JJ Communications."  (Dkt. No. 29, Ex. G).  According to Mr. Chon, JJC's bank rejected the purchase order, and JJC asked Duratech to issue new purchase orders without the guaranty language.

Mr. Chon states that Duratech directed four purchase orders to JJC in response to this request. Mr. Chon maintains that Duratech did not issue these purchase orders for the purpose of buying JJC's products; instead, he states that the purchase orders were created at the demand and direction of JJC to comply with JJC's bank's demand for documentation.  Mr. Chon asserts that "JJC assured both

NuTeck and Duratech that it did not intend to be paid until Costco had remitted payment for the [s]ale of JJC's product." (Dkt. No. 29, at 5).

Shortly before the start of the 2002 road show, Mr. Kim asked Duratech to make a deposit for JJC's products. Mr. Kim states that he asked for a deposit in order for JJC's bank to approve the account. Duratech declined to make such a deposit.

In early February 2002, JJC shipped some products for the 2002 road show. According to Mr. Chon, this shipment was significantly less than the amount of goods that JJC had committed for the upcoming show. In a letter dated February 15, 2002, Mr. Chon asked Dick Ryan of NuTeck to talk to JJC about this shortfall. (Dkt. No. 29, Ex. J). Mr. Chon has submitted an e-mail exchange between Mr. Ryan and Mr. Kim that occurred a few days later. (Dkt. No. 29, Ex. K). In this exchange, Mr. Kim told Mr. Ryan that he was concerned about getting paid promptly by Duratech and that it bothered him that when Duratech received payments from Costco, Duratech would "drag the payment to us."[1] Id. Mr. Kim wrote that "[m]aybe I need a personal guarantee letter" from Mr. Chon. Id.

On February 19, 2002, Mr. Ryan faxed Mr. Kim's e-mail to Tadd Morris of Duratech. (Dkt. No. 29, Ex. L). Mr Ryan suggested that "perhaps a personal letter from George [Chon] promising prompt payment will be sufficient to get back on track." Id. Mr. Chon then sent a letter to Mr. Kim. (Dkt. No. 29, Ex. M). Mr. Chon stated in this letter that "I will give you my personal guarantee that as we receive payment from Costco for the sale of the PenCam and Atlantis Underwater Camera, we will promptly remit payment to JJ Communications with appropriate documentation within 5 days of receipt of payment from Costco." Id. After receiving this letter, JJC shipped additional products to Duratech.

---

[1] In this e-mail, Mr. Kim appears to refer to Duratech as "Marado." Although the parties do not explain in their briefing what "Marado" is, an opinion issued earlier in this case by the District of New Jersey indicates that Duratech marketed "Marado" brand-name products. (Dkt. No. 21).

ORDER - 4

<u>Shipping Problems</u>

Duratech had made arrangements for a company called Farwest Freight to handle shipping for the 2002 road show. Mr. Chon states that Farwest agreed to perform the shipping for $50,000, but ultimately billed Duratech approximately $250,000 for the services. Mr. Chon also maintains that Farwest lost a shipment of JJC product that had an invoice value of $47,000. As a result of these problems, Duratech stopped making payments to Farwest.

According to Mr. Chon, Farwest then began diverting goods that were in transit and alleged a carrier's lien against the goods. Mr. Chon says that Farwest sold the goods in satisfaction of its alleged carrier's lien, including approximately $150,000 of JJC's products. Mr. Chon claims that "JJC had notice of the Farwest litigation and could have intervened to protect its rights in the goods liened by Farwest and mitigate its potential damages, but unreasonably failed to do so." (Dkt. No. 29 at 8).

3. <u>Procedural History</u>

In May 2003, Plaintiff filed this lawsuit in the U.S. District Court for the District of New Jersey. In July 2004, the court in New Jersey transferred the case to this Court. As amended, Plaintiff's complaint raises six claims: (1) breach of contract; (2) account stated; (3) goods sold; (4) open account; (5) unjust enrichment; and (6) quantum meruit. The amended complaint also alleges that Mr. Chon "personally guaranteed payment to JJC or the prompt return of the goods." (Dkt. No. 4, ¶ 5).

**Analysis**

When considering a motion for summary judgment, the Court views the underlying facts in the light most favorable to the party opposing the motion. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). "Summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact. <u>Adickes v. S. H. Kress & Co.</u>, 398 U.S. 144,

ORDER - 5

1  159 (1970). However, once the moving party has met its initial burden, the burden shifts to the

2  nonmoving party to establish the existence of an element essential to that party's case, and on which

3  that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24

4  (1986). To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must

5  have evidence showing that there is a genuine issue for trial. Id. at 324.

6  1.    Defendant Chon's Motion for Partial Summary Judgment

7  Defendant George Chon seeks partial summary judgment on the issue of whether he made a

8  personal guaranty of payment to JJC or the prompt return of JJC's goods. Mr. Chon also asks that all

9  claims against him be dismissed.

10  Plaintiff's allegation that Mr. Chon personally guaranteed payment or return of JJC's goods is

11  founded on the following (undated) letter from Mr. Chon to Jay Kim:

12  Dear Jay,

13  Tadd Morris has asked me to respond to you regarding payment for the products you are
   supplying to support the Costco Road Show and to assure you of prompt payment as these
14  products are sold and paid by Costco.

15  As you know, the Costo Road Shows are a consigned Show. I will give you my personal
   guarantee that as we receive payment from Costco for the sale of the PenCam and Atlantis
16  Underwater Camera, we will promptly remit payment to JJ Communications with appropriate
   documentation within 5 days of receipt of payment from Costco.

17
   As we agreed, the cost for the clamshell packaging will be deducted from the remittances.
18
   Furthermore, at the conclusion of the Shows, any unsold merchandise will be promptly
19  returned to your Company for your use. (What about the fact the product is clamshelled?)

20  Tadd has given you the schedule of total products with the dates they are required. It is my
   understanding you will continue to cooperate and supply product so we might meet our Road
21  Show commitments to Costco. Please let us know your exact shipping schedule for the
   requested quantity by return.
22
   Very truly yours,
23  DURATECH, INC.

24  GEORGE CHON
   PRESIDENT
25

ORDER - 6

(Dkt. No. 29, Ex. M; Dkt. No. 31, Ex. C) (emphasis added).

Plaintiff argues that this letter "clearly establishes that Mr. Chon personally guaranteed payment for the goods that Duratech received from JJ Communications." (Dkt. No. 30 at 5). Mr. Chon argues that Plaintiff's position is inconsistent with the plain language of the letter.

Under Washington law, a guaranty is a contract and is subject to general rules of contract interpretation.[2] <u>Wilson Court Ltd. P'ship v. Tony Maroni's, Inc.</u>, 134 Wn.2d 692, 699, 952 P.2d 590 (1998). "It is a fundamental rule that guarantors can be held only upon the strict terms of their contract, as a contract to answer for the debt of another must be explicit and is strictly construed." <u>Seattle First Nat'l Bank v. Hawk</u>, 17 Wn. App. 251, 256, 562 P.2d 260 (1977). "To determine the intent of the parties, the language of a guaranty agreement should receive a fair and reasonable interpretation reflecting the purpose of the agreement and the right of the guarantor not to have his obligation enlarged." <u>Old Nat'l Bank of Washington v. Seattle Smashers Corp.</u>, 36 Wn. App. 688, 691, 676 P.2d 1034 (1984).

In light of these standards, Mr. Chon's letter cannot be construed as broadly as Plaintiff suggests. Mr. Chon used precise language to state the terms of his personal guaranty: "I will give you my personal guarantee that <u>as we receive payment from Costco</u> for the sale of the PenCam and Atlantis Underwater Camera, we will promptly remit payment to JJ Communications with appropriate documentation within 5 days of receipt of payment from Costco." (emphasis added). By the express terms of the letter, Mr. Chon simply provided a personal guaranty that Duratech would promptly forward payments to JJC from the sale of certain cameras *as Duratech received such payments from Costco*. Plaintiff has offered no evidence that Duratech or Mr. Chon failed to fulfill the terms of this specific guaranty.

---

[2] Neither side argues that the laws of a different state should apply to this dispute.

ORDER - 7

1    Mr. Chon's letter also cannot be reasonably construed as a personal guaranty that Duratech

2 would return unsold goods to JJC. Although Mr. Chon stated in his letter that "at the conclusion of

3 the Shows, any unsold merchandise will be promptly returned to your Company for your use," this

4 sentence does not begin with any language indicating that Mr. Chon was personally guaranteeing that

5 such merchandise would be returned.

6    Plaintiff suggests that Mr. Chon's letter is ambiguous and should be construed against him as

7 the drafter. Whether a contract provision is ambiguous is a question of law. Paradise Orchards Gen.

8 P'ship v. Fearing, 122 Wn. App. 507, 517, 94 P.3d 372 (2004). A contract provision is ambiguous if

9 it is fairly susceptible to two different, reasonable interpretations. Wm. Dickson Co. v. Pierce County,

10 __ Wn. App. __, 116 P.3d 409, 413 (2005). A contract "is not ambiguous simply because the parties

11 suggest opposing meanings." Id. Under these standards, Mr. Chon's letter cannot be regarded as

12 ambiguous. As discussed above, the terms of his personal guaranty are precise and limited.

13    Both sides also offer extrinsic evidence regarding the circumstances surrounding Mr. Chon's

14 letter. Under Washington law, "[e]ven if the contract language is clear and unambiguous, the trial

15 court may consider extrinsic evidence for the limited purpose of determining the intent of the parties."

16 Paradise Orchards, 122 Wn. App. at 517. However, extrinsic evidence is to be used "'to determine

17 the meaning of *specific words and terms used*,' and not to 'show an intention independent of the

18 instrument' or to 'vary, contradict or modify the written word.'" Hearst Communications, Inc. v.

19 Seattle Times Co., 154 Wn. 2d 493, 503 (2005) (emphasis in original) (citations omitted).

20    Plaintiff's extrinsic evidence includes a declaration from JJC's president Jay Kim, in which Mr.

21 Kim states that he "advised Duratech that George Chon would need to provide JJC with a personal

22 guaranty for purchase of the goods in order for our bank to approve the sales to Duratech." (Dkt. No.

23 31, ¶ 11). However, this extrinsic evidence cannot serve to show an intention independent of the

24 instrument or to vary, contradict, or modify the actual language used in Mr. Chon's letter. Although

25 Mr. Kim may have desired an unqualified personal guaranty for the purchase or payment of JJC's

ORDER - 8

goods, the actual language used in Mr. Chon's letter is carefully limited and does not provide such a sweeping guaranty.

By contrast, Mr. Chon has introduced extrinsic evidence regarding the circumstances surrounding the issuance of his letter that is largely consistent with the limited terms of the personal guaranty stated in the document. On February 18, 2002, Dick Ryan of NuTeck sent an e-mail to Mr. Kim asking if Mr. Kim was concerned about "whether you will get paid as money flows in from Costco??" (Dkt. No. 29, Ex. K). Mr. Kim replied "Yes, I am concern[ed] about Morado [apparently a reference to Duratech] paying us in time when they get paid from Co[st]co." Id. Mr. Kim also wrote that "it bothers me [that] when [Mr. Chon] gets paid by Co[st]co, he will drag the payment to us to fund other stuff." Id. On February 19, 2002, Mr. Ryan sent a copy of Mr. Kim's e-mail to Tadd Morris of Duratech, indicating that "perhaps a personal letter from George [Chon] promising prompt payment will be sufficient to get back on track." (Dkt. No. 29, Ex. L). Mr. Chon's letter appears to address Mr. Kim's concerns by providing a personal guaranty that Duratech would promptly remit payments to JJC as Duratech received payments from Costco for the sale of JJC's products.

In light of the analysis above, the Court finds that there are no genuine issues of material fact that would preclude entry of summary judgment in favor of Mr. Chon. By its express terms, Mr. Chon's personal guaranty simply provided that Duratech would promptly remit payments to JJC *as Duratech received payments from Costco* for the sale of JJC's products. Plaintiff has not offered any evidence that Mr. Chon or Duratech failed to uphold this specific guaranty, nor is Mr. Chon's letter ambiguous. In addition, Mr. Chon did not make an explicit personal guaranty that JJC's unsold products would be returned. As such, there is no basis to hold Mr. Chon personally liable for any of Plaintiff's asserted claims.

ORDER - 9

2.  Plaintiff's Cross-Motion for Summary Judgment

In its brief in opposition to Defendant Chon's motion, Plaintiff moved for summary judgment on all claims asserted in its complaint. Defendants did not file a substantive response to Plaintiff's cross-motion, but instead moved to strike the motion as untimely and improperly noted. Defendants are correct that Plaintiff's cross-motion was untimely. Under the case scheduling order, the deadline for filing dispositive motions in this matter was August 16, 2005. (Dkt. No. 26). Plaintiff's cross-motion was not filed until September 6, 2005. In addition, Plaintiff improperly noted its cross-motion for September 9, 2005, rather than on the fourth Friday after filing (September 30) as required by Local Civil Rule 7(d)(4). Therefore, Plaintiff's cross-motion for summary judgment will be stricken as untimely and improperly noted.

**Conclusion**

Washington law provides that a guaranty must be explicit and is strictly construed. Consistent with this rule and general principles of contract law, Mr. Chon's limited and unambiguous personal guaranty cannot be construed in broad manner suggested by Plaintiff. Because there is no evidence that Mr. Chon failed to uphold the express terms of his personal guaranty, Defendant Chon's motion for partial summary judgment is GRANTED and all claims against Mr. Chon are dismissed. Finally, Plaintiff's cross-motion for summary judgment is STRICKEN because it was filed after the dispositive motion deadline and was not properly noted.

The clerk is directed to provide copies of this order to all counsel of record.

Dated: October 4, 2005

                                          s/Marsha J. Pechman_____
                                          Marsha J. Pechman
                                          United States District Court